## GLINES v. SMITH.

To state that a man is guilty of " willfully and maliciously poisoning a horse," is not charging him with the commission of any offence under our statute, and whether it is charging him with an offence at common law, *quaere ?*

To state that a man is guilty of " poisoning a horse," is not charging him with the commission of any crime, either under our statute or at common law.

In an indictment containing several counts, with a general verdict of guilty, the verdict will be sustained and the judgment will not be arrested, if there is one good count in the indictment.

But in a civil suit, where there are several counts, on each of which damages are claimed, with a general verdict for the plaintiff, if one count is bad, the judgment must be arrested on motion, because the court have no means of apportioning the damages. But where in a civil suit there are several counts, but all describing the same cause of action, each setting it forth in a different way, and where damages are sought to be recovered only on some one count, and these facts appear in the case, or from the certificate of the judge who tried the case, and also that all the evidence was applicable to the good count, and that the same was fully proved, the verdict will be sustained if there is one good count in the writ, even though all the rest may be bad, and the verdict may be amended so as to apply to the good count when necessary ; but the judgment will not be arrested.

It will be irregular for the judge, at the trial of a cause, even at the request of the jury, to send to them minutes of " the strongest or most direct evidence," on one side alone, on a material point, and a verdict will be set aside for that cause.

When witnesses are called to impeach a principal witness, by stating that such witness has, out of court, made statements in conflict with his testimony on the stand, such witness may be recalled and asked the direct question, whether or not he made the statements thus imputed to him, though the question may be leading in form.

CASE for slander. The writ was dated Sept. 8th, 1866. The declaration, excepting the fourth and seventh counts, which were stricken out by amendment, is made a part of the case. The defendant pleaded the general issue, with a justification alleging the truth of the words. The jury rendered a verdict for the plaintiff. The defendant now moves in arrest of judgment on the ground that the declaration does not contain any allegation or allegations, showing that the defendant charged the plaintiff with a crime, nor any showing special damages.

The jury during their deliberations sent to the judge a written inquiry, to which he returned a written answer, a copy of which marked A, is annexed, and makes a part of the case. The extracts contained in the judge's reply, were copied by him from his minutes of the testimony taken on the trial; and the matters there set forth were testified to by the witnesses mentioned. In his charge the judge had read these extracts to the jury with all the other parts of the testimony of those and other witnesses of the plaintiff directly relating to the charges in his writ. This correspondence was had by the judge with the jury without consultation with either party, and without the knowledge of either at the time.

The plaintiff offered his wife as a witness. The defendant objected to her admission. The court held that under the statute she was admissible as a witness for certain purposes. The defendant requested that the plaintiff would specify the points on which he proposed to examine said witness. The defendant then specified the following points :

1. As to what the plaintiff did with the arsenic when he brought it home June 10th, 1856, and as to what he did with the arsenic at any time.

2. For the purpose of contradicting Louise F. DeForest as to alleged statements of the plaintiff in the presence of his family.

3. To show the relations and state of feeling existing between William P. Glines and his wife, (now the said Louise DeForest,) and also the state of feeling between William P. Glines and this plaintiff.

4. Relative to statements, the witness (Mrs. Glines) had been reported to have made to a Mrs. Kasson. (This matter upon the objection of the defendant, was excluded by the Court.)

5. In relation to any other points as to which the testimony of the witness is admissible under the statute.

To each and all these matters the defendant objected as incompetent, because the witness was the wife of the plaintiff.

The deposition of Louise F. DeForest had been taken and used by the defendant. It was proved by the defendant, that the plaintiff had. stated that at one time he moved the arsenic in question from a place known to his son William, to a place unknown to him, for fear his son should use it to make way with himself, as he had threatened to do on account of difficulties between him and his wife, (the said Louise.)    It was claimed by the defendant and denied by the plaintiff that at one time the plaintiff had taken measures to effect a reconciliation with said William and induce his return to his (the plaintiff's) house in order that said William should not testify against his father in regard to certain matters involved in this case.

Mrs. Glines testified as follows, the defendant objecting to her whole testimony and to all the questions and answers as incompetent by reason of the marital relation :

" I remember my husband getting some arsenic. I think it was about the time of planting corn, in 1856. He came home with it, nobody else was present but him and me.

1.    Q.    What did he do with the arsenic?

A.    He fetched it home and undid it.    He put it into an iron spider, and put in some water, and put some corn in the spider, and then carried the corn out.    I don't know what he did with it.

2.    Q.    Did he use it all, if not what did he do with the balance, if you know ?

A.    He did not use it all, he used the biggest part of it.    Couldn't tell how much of it, but the biggest part.    Then he did it up in the same paper it was brought in, and started at first to put it into the cupboard or buttery.    He then went out and carried it out of the house. William was married Dec. 3d, 1857.    He and his wife lived with us in the same house till they went into the new house, I think the last of October, 1858.    Should think we all ate at the same table till March, 1858.    We had trouble and couldn't agree very well.    That was the reason we ate at separate tables.    The request to have separate tables was made by William's wife.    Sometimes William and his wife were pleasant and sometimes they were not.    They had some breakage.    My son's health was always poor.    He was subject to fits; sometimes he would have two or three in a day, and sometimes he would go two or three months without any.

3.    Q.    State whether or not you heard Mr. Glines say to his son or his son's wife, or in their presence, that he did not wish to have them talk about the poisoning of Smith's horse ; that he did not wish to have them talk about it at the table, or after dark, on account that some one might be out, or at the window and overhear what was said, or to that effect ?

A.    I never did.

4.    Q.    State whether or not you ever heard Mr. Glines tell William that he heard he was going to testify something against him ; that if he ever did give in a word of testimony against him, he should never have a dollar of his property, for he would will it to strangers first ; if his son Henry should not. be alive he would will it to strangers, or any thing to that effect ?

A. I never did.

5.   Q.   Did you ever hear him say to his son's wife, or in her presence, that he had laid some arsenic in a brace in the barn, and that it was gone, and that he was afraid it might get somewhere where it would get into the hay, and the cattle might get it, or any thing to that effect?

A.   I never did.

6.   Q.   What was the state of feeling on the part of your son's wife toward Mr. Glines?

A.   They were very much at variance.   It was a continual contention all the time between William and his wife.   She was in a stew all the time.   There was a difficulty between her and my husband.

7.   Q.   Do you know anything about your son William's having strychnine about the same time?

A.   He came home from Mr. Jewett's with some strychnine.   He put it in the spider with water and corn as his father did, (with the arsenic,) and strewed the corn over the field.   He took the corn and carried it off.   He used all (the strychnine) he got.

The foregoing questions numbered 3, 4 and 5 were also excepted to as leading.   Louise F. DeForest had previously testified that the plaintiff did say the things implied by the questions in presence of his family during the time referred to by Mrs. Glines.   The questions were all admitted by the court in the exercise of its discretion, if leading.

The plaintiff was put upon the stand and was asked by his counsel the following questions,—one Hayward, a witness offered by the defendant, having previously testified that the plaintiff had said to him the things implied by said questions, i. e. : " Did you say to Haywood that after tying up the balance of the arsenic not used, you put it away in the house, and afterwards moved it to the barn and put it in a brace?" " Did you tell Haywood that there was very little left of the arsenic, not enough to poison a horse?"

The questions were both admitted by the court in the exercise of its discretion, if leading, and answered by the witness in the negative.

Before these questions were put, the witness had, in reply to a general inquiry, stated all the conversation with Haywood that he recollected.

Ordered, that the foregoing case be transferred to the whole court, for their consideration and final decision.

## PAPER A.

The interrogatory propounded to the judge, was signed by the foreman, and was as follows :

" Please to give us the strongest or most direct statement of Smith, charging Glines with poisoning the defendant's horse."

To which the judge returned the following answer : " Dan'l Merrill testifies, I asked Mr. Smith if he had any doubt about Mr. Glines' poisoning his horse.   *Mr. Smith said he had no doubt of it in his mind.*

I asked Mr. Smith what induced Mr. Glines to poison his horse. Smith said it was on account of some of his sheep getting into his corn, &c. Smith admitted that what Merrill said was correct. It is for you to say what does the above language import or mean. *Samuel Pike* testified that Smith said to him that he had a horse die suddenly. Said he had no doubt Glines poisoned it. I told him it was a hard case if so. He said he had no doubt he, (Glines,) poisoned his horse and that some arsenic was found in his barn. On cross-examination Pike testified, that Smith said Glines poisoned the horse. The above testimony is an extract of the testimony of said Merrill and Pike."

This was signed by the judge, and directed to the foreman.

## DECLARATION.

1st. In a plea of the case for that, &c. (Allegation of plaintiff's good name, &c.) Nevertheless, the said defendant not being ignorant of the premises; but fraudulently, wickedly and maliciously contriving to injure, blacken and defame the plaintiff in his good fame and reputation, and to injure him in his business, and to expose him to the pains and penalties prescribed by law for wilfully and maliciously poisoning horses, did heretofore, to wit, at said Haverhill, on the first day of January, in the year of our Lord one thousand eight hundred and sixty-six, in the presence of divers good citizens of this State, and in conversation with the same, speak, utter and publish with a loud voice, the following false, scandalous and malicious words of and concerning the plaintiff, to wit. : " Have you," meaning all of the said persons with whom he, the said defendant, was conversing as aforesaid, " heard about my having a horse poisoned? I want you," meaning the person last aforesaid, " to go and talk with Mr. Glines," meaning the plaintiff, " and give him a chance to settle it without going to law," meaning that he wished said person to go to the plaintiff and talk with him, and induce him to compound and settle the pretended matter of wilfully and maliciously poisoning the plaintiff's horse, by threatening him with a criminal prosecution therefor in behalf of the State. " I have no doubt that he," meaning the plaintiff, " did it," meaning that the defendant had no doubt that the plaintiff wilfully and maliciously poisoned the plaintiff's horse; " but I am willing to settle it without going to law, if he will," meaning that the defendant was willing to settle for and compound with the plaintiff, the pretended charge and matter of the plaintiff's wilfully and maliciously poisoning the defendant's horse, if the plaintiff would pay him a sum of money. " I think my evidence sufficient to convict Mr. Glines," meaning that he thought his evidence sufficient to convict the plaintiff of the crime of wilfull and malicious poisoning the defendant's horse; " I have showed the papers to Felton, and Felton thinks he may be indicted," meaning that he had shown to Mr. Felton, an attorney and counsellor-at-law, certain papers containing evidence showing that the plaintiff had wilfully and maliciously poisoned the plaintiff's horse, and that said Felton thought that said papers did show the same, and con-

tained evidence sufficient to cause the plaintiff to be indicted thereof; " I wish you," meaning said person, " to talk with Glines," meaning the plaintiff, " and see if he will settle for the horse : I will take of him one hundred and fifty dollars, and the interest since the poisoning, about eleven years ago : I ought to have more than that ; but you may tell Glines that if he will pay me one hundred and fifty dollars, I will settle it all up, and that shall be the end of it ; · but unless he does settle it, I intend to push it through at the court soon to sit at Haverhill," meaning that the defendant wished said person to talk with the plaintiff, and see if he, *the plaintiff*, would settle, compound with the defendant for the pretended crime of poisoning the defendant's horse, and that the defendant proposed to take and receive of the plaintiff one hundred and fifty dollars, and interest on said sum since said pretended poisoning, about eleven years before the time of said conversation, and that if the plaintiff would pay the defendant said sum and interest as aforesaid, the defendant would settle and compound with the plaintiff ·said alleged crime ; but that if the plaintiff would not pay the defendant said sum and interest as aforesaid. then the defendant would institute and cause to be brought against the plaintiff, a criminal prosecution in behalf· of the State for said pretended crime at the then next term of the supreme judicial court at said Haverhill ; and further meaning, intending and insinuating, by the several words aforesaid, that the plaintiff had been guilty of the atrocious and infamous crime of wilfully and maliciously poisoning a horse.

2d.   And the plaintiff further says that thereafterward, to wit, at said Haverhill, on said first day of January, A. D. 1866, in a certain other discourse, which said defendant then and there had with divers other good and worthy citizens of this State, of and concerning the plaintiff, the said defendant, with the malicious contrivance and intention aforesaid, and for the several purposes aforesaid, did falsely and maliciously say, speak and publish of and concerning the plaintiff in the presence and hearing of said last mentioned citizens, these other false, scandalous and malicious words following, to wit: " Some one has poisoned my horse.   I opened the horse and found arsenic in the stomach.   Two physicians examined it.   I think James Glines," meaning the plaintiff, " did it," meaning that the defendant thought that the plaintiff poisoned the defendant's said horse.   " What makes me think it was Glines," meaning the plaintiff, " there was arsenic in his barn. I should have tried to get him," meaning the plaintiff, " indicted for it," meaning the said pretended crime of poisoning the defendant's horse, " if I had not got hurt," and further meaning, pretending and insinuating, by the several words aforesaid, that the plaintiff had been guilty of the atrocious and infamous crime of wilfully and maliciously· poisoning a horse.

3d.   And the plaintiff further says that afterwards, to wit, at said Haverhill, on said first day of January, A. D. 1866, in a certain other discourse which the said defendant then and there had with divers other good and worthy citizens of this State, of and concerning the plaintiff, the said defendant, with the malicious contrivance and intention afore-

said, and for the several purposes aforesaid, did falsely and maliciously say, speak and publish of and concerning the plaintiff, in the presence and hearing of those last-mentioned citizens, these other false, scandalous and malicious words, to wit : " Will you," meaning one of these last-mentioned persons, " go and see Mr. Glines," meaning the plaintiff, " about that horse affair," meaning said affair and matter of said pretended poisoning by the plaintiff of defendant's said horse. " I would like to have you go and bring about a settlement with Glines," meaning the plaintiff. " I am willing to take the value of the horse and settle it up," meaning that the defendant was willing to take of the plaintiff, the value of defendant's said horse, which he pretended had been poisoned by the plaintiff, as aforesaid, and settle, compromise and compound therefor, said pretended crime of the alleged poisoning by the plaintiff of defendant's said horse. " I think I have evidence enough to convict Glines," meaning the plaintiff. " If he," meaning the plaintiff, " will pay me the value of the horse," meaning the horse which the defendant pretended was poisoned by the plaintiff as aforesaid, " I will settle and keep it still, and nothing more will ever be done about it. Dr. Morgan examined the horse's stomach and said he was poisoned with arsenic," meaning that the defendant thought he had evidence enough to convict the plaintiff of the crime of wilfully and maliciously poisoning said horse in a criminal prosecution against him in the name of the State therefor, and further meaning and insinuating by the several words aforesaid, that the plaintiff had been guilty of the atrocious and infamous crime of poisoning a horse ; and also meaning and intending by the several words aforesaid, to procure and cause said person to whom said words were spoken as aforesaid, to go to the plaintiff and induce him to settle and compromise with the defendant, by paying to the defendant a sum of money for said crime of poisoning said horse by threatening the plaintiff with a criminal prosecution in the name of the State for said pretended crime.

5th.    And the plaintiff further says that heretofore, to wit, at said Haverhill, on the first day of January, A. D. 1865, in a certain other discourse which said defendant then and there had with divers other good and worthy citizens of this State, of and concerning the plaintiff, the said defendant, with the malicious contrivance and intention aforesaid, and for the several purposes aforesaid, did falsely and maliciously say, speak and publish of and concerning the plaintiff, in the presence and hearing of those last-mentioned citizens, these other false, scandalous and malicious words following, to wit : " I have no doubt that James Glines," meaning the plaintiff, " poisoned my horse," meaning and insinuating by the several words aforesaid, that the plaintiff had been guilty of the atrocious and infamous crime of poisoning a horse.

6th.    And the plaintiff further says that heretofore, to wit, at said Haverhill on the first day of January, A. D. 1865, in a certain other discourse, which said defendant then and there had with divers other good and worthy citizens of this State, of and concerning the plaintiff, the said defendant, with the malicious intention and contrivance aforesaid, and for the several purposes aforesaid, did falsely and maliciously

speak, say and publish of and concerning the plaintiff, in the presence and hearing of those last-mentioned citizens, these other false, scandalous and malicious words following, to wit : " All I lack is a little evidence·on one point to make the proof clear that James Glines," meaning the plaintiff, " poisoned my horse, and as soon as I can, I am going to prosecute him for it. There is no doubt of his guilt, he did poison my horse," meaning by the several words aforesaid, that the plaintiff had been guilty of the atrocious and infamous crime of wilfully and maliciously poisoning a horse.

By means of the speaking of which said several false, scandalous and defamatory words, and of the said false and malicious charge, the plaintiff is greatly injured and prejudiced in his good name, character and reputation aforesaid, and has been suspected to have acted unworthily, unjustly and feloniously and has been rendered liable to be prosecuted and indicted for the crime of wilfully and maliciously poisoning a horse, and has undergone great pain, distress and trouble both of body and mind, and has been otherwise greatly injured and prejudiced.

SARGENT, J. The motion in arrest of judgment is upon the ground that the declaration does not contain any allegation showing that the defendant charged the plaintiff with any crime, nor any charging special damages.

It is not claimed that any of the counts allege any special damage ; but the claim is that they allege that defendant charged the plaintiff with having committed a crime indictable by our laws.

What are the allegations in the writ?

1st count, after setting forth words spoken with innuendos, closes as follows : " and further meaning, intending and insinuating by the several words aforesaid, that the plaintiff had been guilty of the atrocious and infamous crime of wilfully and maliciously poisoning a horse." This embraces all that is charged, or attempted to be charged, in the count.

2nd count substantially like the first.

3d count closes as follows : " and further meaning and insinuating by the several words aforesaid that the plaintiff had been guilty of the atrocious and infamous crime of poisoning a horse."

4th count was stricken out before trial.

5th count was like the third.

6th count like the first.

In the 1st, 2nd and 6th counts the defendant is alleged to have charged the plaintiff with " *wilfully and maliciously poisoning a horse;* " and in the 3d and 5th counts, with " *poisoning a horse.*"

There are three provisions of our statute, under which, or some one of which, it is claimed that the charge here alleged to have been made against the plaintiff, amounts to charging him with the commission of a crime. The first is chap. 229, sec. 11 Comp. Stats., which provides that " if any person shall wilfully and maliciously kill, maim, wound, poison or disfigure any horse, cattle, sheep or swine of another, with intent to injure their owner or any other person, he shall be punished," &c. But under this provision, the person must not only poison a horse,

or wilfully and maliciously poison a horse, but it must be, and must be alleged to be, the horse of another, and the act must be done and must be alleged to have been done, with intent to injure its owner or some other person, and without this intent charged and proved, no crime would be charged or committed under this section.

Chap. 233, sec. 12, Comp. Stats., provides that if any person shall wilfully and maliciously kill, maim, beat or wound any horse, cattle, sheep or swine, he shall be punished," &c. But it is not charged that the horse which the plaintiff was accused of poisoning was killed, maimed, wounded, or in any way injured by the poison, so that no crime was charged under that section.

Chap. 229, sec. 19, Comp. Stats., is the other section which provides that " if any person shall wilfully and maliciously commit any act * * * whereby the real or personal estate of another shall be injured, he shall be punished," &c.

In this case there is no charge that the horse was injured, and for aught that appears, the poison may have been administered as a medicine, or if administered wilfully and maliciously, it may have failed to injure the horse. To constitute any offence under that section, the plaintiff must have been charged with having injured the property of another by his act, which was not charged in this case.

*Atkinson* v. *Scammon*, 22 N. H. 40, is a case in point, where it is held that it is not enough that we may be able to imagine how the words charged may possibly have been spoken in an actionable sense. In this case, the words charged and proved do not *necessarily* imply a charge of the commission of any crime under the statute, nor are they aided by any averments which show that the words were spoken with any purpose or intent to charge the commission of any crime. *Edgerly* v. *Swain*, 32 N. H. 478.

But it is claimed that though the words charged in this case did not constitute an accusation of crime under our statute, still that they charged what would be a crime at common law.

We find some authorities which hold that at common law it was a crime wilfully and maliciously to poison a horse; but we are not certain whether they mean that it was a crime to kill a horse, or any other domestic animal, wilfully and maliciously, by poison or by any other means, about which there is no doubt; *People* v. *Smith*, 5 Cowen, 258; Wharton's Am. Cr. Law, sec. 5; *Com.* v. *Leach*, 1 Mass. 59; or whether the mere poisoning of the horse, wilfully and maliciously, without regard to the consequences or effect of the poison, as the last case above cited would seem to indicate; nor is it material in this case. Were it not for this case, *Com.* v. *Leach*, and what is said of it in Davis's Precedents and other elementary works, we should conclude, that something more was necessary to make the act even a misdemeanor at common law.

All these cases of indictments for killing, maiming and wounding animals come under the general head of malicious mischief or injury, and to constitute the offence it would seem that some mischief or injury must have been accomplished, or at least intended, by it, and the fact

that the mischief was either done or intended to be done should be alleged, as it would seem, in the indictment, and proved on the trial.

The general allegation that an act was wilfully and maliciously done would not seem to be sufficient where the act, in order to be criminal, must have resulted in mischief or injury, or have been intended to produce such result. The act may have been wilfully and maliciously done in the general broad sense of those terms, as it would seem, without the existence of the particular intent, which must have accompanied the act, to make it criminal. *Commonwealth* v. *Brooks*, 9 Gray, 303, would seem to favor this view.

So in *State* v. *Briggs*, 1 Aiken, Vt. R. 226, it was held that if one confine colts in his enclosure, and then from motives of wilful and malicious mischief, fix a scythe in the bar way leading from said enclosure, the edge of the scythe being inward towards the enclosure, and then *with intent* to wound, maim and destroy said colts, did drive said colts over the bar way, and over the scythe so fixed as aforesaid, whereby said colts were lacerated and wounded, he is guilty of a misdemeanor at common law.

So a prisoner was indicted in England for a misdemeanor in administering poison, to wit, sulphuric acid, to six horses with intent maliciously to kill them, and it appeared that the prisoner mixed sulphuric acid with a quantity of corn, and gave each horse his feed, they all being in the same stable. But it was shown that sulphuric acid was given to horses sometimes by their grooms, under an idea that it would make their coats shine, and it was left to the jury to find whether the poison was administered with the intent charged in the indictment, or whether he had done it under the impression that it would improve the appearance of the horses, and in the latter case he would be acquitted. *Rex* v. *Mogg*, 4 Car. & P. 364; 2 Russ. on Crimes, 573.

But it is not important here to settle the point, since whether it was or not a crime to " wilfully and maliciously poison a horse" without any specific intent, the simple charge of " poisoning a horse" cannot be an indictable offence at common law, because a horse might be poisoned and not die or be injured ; the poison may be administered for the purpose of improving his appearance, or as a medicine to remedy some disease, and where the effect may be beneficial instead of injurious. A man might poison his own horse and cause death thereby, and commit no crime, or even any wrong in any sense, if the horse was so injured that he could not recover, and this course was taken to relieve him from protracted suffering. Thus the 3d and 5th counts are clearly defective in not charging any crime at common law.

And where there are several distinct counts, as in this case, each one stating a distinct and separate cause of action, and there be a general issue pleaded to all, and a general verdict upon all the counts, and an assessment of damages generally, and one of the counts be bad, judgment will be arrested, unless the judge who tried the cause, can and does certify, that all the evidence introduced applied to the good counts only, in which case the verdict may be amended so as to apply to the good counts only. *Atkinson* v. *Scammon*, 22 N. H. 40, where it is

said by Perley, J., that "by a well settled and familiar rule of pleading, the verdict for the plaintiff being general, and one count bad, the judgment must be arrested." *Peabody* v. *Kingsley*, 40 N. H. 416, and numerous authorities cited by counsel and court.

So *Richardson* v. *Mellish*, 3 Bing. 334, (11 E. C. L. 167) is a leading case on that subject, where it is held that, in order so to amend a general verdict as to have it apply to a good count only, when there are both good and bad counts in the declaration, it must appear that the good count was fully sustained in all its material allegations by the evidence at the trial, and also that all the evidence given at the trial was admissible under that count. *Sullivan* v. *Holker*, 15 Mass. 374; *Pattee* v. *Guernsey*, 17 Mass. 182. In this case no such certificate of the presiding judge is given, and we infer that none could properly be given, because so far as the evidence in the case is reported, it seems to bear more directly upon the bad counts, or one of them (the 5th,) than any other. In the absence of such certificate by the judge who tried the cause, judgment must be arrested. *Small* v. *Rogers*, 46 N. H. 176.

I am aware that in some jurisdictions they have relaxed this rule somewhat. In New York, *Sayre* v. *Jewett*, 12 Wend. 135, it is held that where the certificate of the judge who tried the cause is, that all the evidence on the trial would properly apply to the good count as well as to the bad one, there the verdict may be amended so as to apply to the good count only, upon payment of the costs of the motion in arrest.

And in Vermont, in *McDuffie* v. *Magoon*, 26 Vt. 523, after deciding that in that case no presumption could be allowed that the verdict was taken upon the bad counts, inasmuch as from the whole case it appeared that the evidence was entirely and solely applicable to the good one, which is all, perhaps, that would be required here, Judge Redfield adds the following *dictum* : "In cases where nothing appears to show on which count a verdict is taken, and some of the counts are good and some bad, we now allow the same presumption in favor of the proceedings, which we do in favor of all other proceedings of this character, and which was always allowed in criminal proceedings, that it is more likely that the verdict was taken on the good counts than upon the bad ones." That doctrine has never been adopted in this State.

Here we have followed the rule as stated by Chitty in his work on Pleading, vol. 1, page 411, (9th Am. Ed.) The reasons assigned for this practice, where there is a general verdict upon several counts, some of which are good and others bad, is that the court do not and cannot know upon which count the damages were assessed; the court cannot tell but all the damages were assessed by the jury upon evidence introduced solely to establish the charge made in the counts which are bad. But when the count can be made reasonably certain as to that fact, as by the jury's finding for one party on one count, and for the other party upon the other, or by assessing damages on the sufficient counts, saying nothing of the others, or by the certificate of the judge who tried the case, that the evidence on trial was all applicable to the good

counts, then the verdict may be amended when necessary; but the judgment will not be arrested. *Blanchard* v. *Fisk*, 2 N. H. 398.

The reason for the distinction in this respect between declarations with several counts, some good and some bad, with a general verdict, and indictments, where it is held that if there be one good count and others bad and a general verdict of guilty, judgment will not be arrested, as stated by Chitty in his Crim. Law, vol. 1, p. 249, is that in the civil case the jury find entire damages and the court cannot apportion them, whereas, in the criminal case, the court themselves regulate the severity of the sentence,. and can do so according to their discretion upon those points of the indictment which are supported ; and he refers to 1 Salk, 384, *Regina* v. *Ingram*, which was a case of assault and battery, where it was said : " In a civil action where one part of the declaration is ill, and the jury find entire damages, the judgment must be arrested, because the court cannot apportion them ; but in indictments the court assess the fine, and they will set it only according to those facts which are well laid. If an offence sufficient to maintain the indictment be well laid 'tis enough."

In *People* v. *Curling*, 1 Johns. 322, the court of New York held that the reason for this rule in criminal cases was that the prisoner has been convicted of the *whole matter* included in the good as well as the bad counts, and that if judgment were only entered on the good counts, no injustice could be done. In this view, perhaps, some reason may appear for the different rule applied in the two cases.

As we understand the rule, it does not appear particularly objectionable. In an indictment, only one offence is charged. The different counts are only different forms of describing or setting forth the same charge. If one of these counts is good, and the others bad, and the evidence sustains the good one, that would be enough. But if there is a general verdict, finding the respondent guilty of all the charges, that covers the good count and all the bad ones. But he is only charged with one offence, and in one count that offence is properly described and set forth, and he is only to be sentenced for one offence, no matter in how many different forms it is charged.

The established rule is clearly right so far that in indictments, containing several counts, with a general verdict of guilty, the verdict will stand if there is one good count in the indictment.

But take a civil cause like the present, where there are several counts, and each count charges, as seems to be the case here, a separate and distinct conversation in which defendant is charged with slandering the plaintiff, and upon any one of which alone an action might be maintained, and upon each and all of which separate and distinct damages were claimed, there a general verdict on all the counts would be a finding that the jury found all the charges proved and had assessed damages upon all, and that the sum of all these damages added together, was the amount of their general verdict.

In such case, unlike the indictment, plaintiff may join these several distinct causes of action in one suit, and may properly recover all his damages in a single verdict. But if there are several counts, upon

each and all of which damages are assessed in a general verdict, and some of these counts prove to be bad, then the amount of damages assessed on that count should be deducted; but as that cannot be done, the court having no knowledge of the different amounts found by the jury on the several counts, and no means of properly apportioning the damages, the whole verdict must be set aside. We can certainly see no ground to complain of the rule in such a case. So in a civil suit for damages for several assaults and batteries, where each of several counts set forth a separate and distinct battery, for which separate damages were claimed, the rule would hold good.

But in case there are several counts in slander or trespass, and all the counts set forth the same charge, only in different form, and that fact is understood, then there being but one cause of action, there could be an assessment of damages only for one cause, on all the counts, and if either one of the counts were good, then, as in the case of the indict. ment, the verdict ought to stand. In such case, it would be in fact immaterial whether all the counts were good or only one of them, the same damages would be assessed in either case.

But in such a case, the court would give the jury such instructions as would make the case and the verdict intelligible, ordinarily; or if not, and the jury found a general verdict on all the counts, and it afterwards proved that some of the counts were bad, and there was no other way in which the court, at the law term, could tell from the case whether damages were claimed on all the counts, or only on one, then a certificate of the judge who tried the case would generally set the matter right, so that the verdict might be amended so as apply to the good counts only.

The sending of the written extracts from the judge's minutes of the evidence was irregular. In *Sargent* v. *Roberts*, 1 Pick. 337, the jury being unable to agree about the facts, and wishing to be discharged, the judge sent them a written communication declining to discharge them, and giving them " such directions as would enable them to reconsider the cause in a more systematic manner." The verdict thus obtained was set aside, and it was held that no communication whatever should be made to the jury by the court after the cause is finally committed to them, unless in open court.

But such is not the law or the practice in this State. In *Shapley* v. *White*, 6 N. H. 172, this subject was before the court, and though it was there said that the verdict in *Sargent* v. *Roberts, supra*, was no doubt properly set aside, yet the court refused to carry the rule so far as had been done in Massachusetts; but after examining the authorities, the court, Parker, J., says : " The principle to be deduced from these cases seems to be a sound one. If the jury after an adjournment put a question respecting the facts of the case to the court, it will be irregular to state the evidence relating to it; but if they desire instruction upon a mere question of law, that may be answered, but in such a way that the parties may take their exception to such instructions."

That decision has been the rule followed and applied in all cases since, so far as I know. Cases have arisen where the jury have been

called back into court, and the evidence on certain points, or the statements of particular witnesses on each side, have been read to them by the judge from his minutes, by agreement of parties.  During the charge the court may properly advert to the evidence or recapitulate the testimony on both sides, may comment upon it, &c.; but when the cause has once been committed to the jury, the court should ordinarily make no further comment or communication in relation to the facts of the case.

Especially would it be irregular for the judge to state in writing to the jury the evidence on one side only, or to select the strongest and most direct testimony on one side, and state that to the jury in writing and omit all the rest, nor would it make the case any better if the jury had asked for such minutes of the testimony.  Having received these minutes and all the rest being absent, the whole discussion would be likely to turn and the whole case be decided upon that alone, and the rest of the testimony would evidently be lost sight of.  Their attention would be more particularly and directly turned to the minutes that were before them in the handwriting of the judge, and which was admitted to be the strongest evidence in the case on one side, without being accompanied by any of the evidence on the other side.

In *Knight* v. *Coleman*, 19 N. H. 118, the verdict was set aside because certain portions of the deposition read to the jury by a party had been *underscored* by line, so as to attract the attention of the jury, as being of peculiar importance.  Upon the same principle we think this verdict must be set aside, and that the rule as stated in *Shapley* v. *White, supra*, and which has been so long followed, may be safely followed in the future as in the past.

To the same effect is *Bunn* v. *Croul*, 10 Johns. 239.  There after the jury had retired to deliberate on their verdict, they requested the justice to inform them whether a certain point of evidence had been given.  He informed them that it had been given, and mentioned the witnesses who had testified to the facts : Held erroneous, and the judgment was reversed, it not being done by consent, or in the presence of the parties.  The rule in *Shapley* v. *White, supra*, has been also reaffirmed in *Bassett* v. *Manuf. Co.* 28 N. H. 458.

Mrs. Glines was improperly admitted as a witness.  In the act of June session, 1868, the General Statutes of the State are amended in various particulars.  Sec. 52 provides that sec. 20, chap. 209, General Statutes, shall be regarded and constructed as applying to cases pending in the courts of this State, at the time of the passage thereof, as well as to cases commenced subsequent thereto.  But this witness was introduced and admitted under section 22 of said chapter, which was a new section, and entirely independent of section 20, and was not affected by the law of 1868.  There is nothing in the section itself, nor anything in the circumstances under which the law was enacted, which tends to show that the Legislature intended to make it apply to suits then pending, and under such circumstances it would not be held so to apply by the court.  *Rich* v. *Flanders*, 39 N. H., and cases cited.  If the Legislature of 1868 had intended to have it so applied to pending suits, they would have included that with section 20, in their act.

The leading questions were properly put to Mrs. Glines and to plaintiff, it being for the purpose of contradicting the defendant's witness. Prof. Greenleaf says, 1 Greenl. Ev. sec. 435, when a witness is called to contradict another who has stated that such and such expressions were used or the like, counsel are sometimes permitted to ask whether those particular expressions were used, or those things said, instead of asking the witness to state what was said.    This is spoken of by Starkie (1 Stark. Ev. 152) as the usual practice.    Phillips thinks it the preferable course to ask the witness first what was said, and then, if desired, whether the particular expression sworn to by the other witness was used or not.    1 Ph. Ev. 269.

In *State* v. *Winkley*, 14 N. H. 480, the exception seems to have been exactly the reverse of this.    There the objection was that the witness was allowed to state in such case what was said by him at such conversations, instead of being asked whether or not he had stated such and such things in the leading form as in this case.    It was then held, as we understand it, that the witness might state the conversation, or he might be asked the direct leading question.    Gilchrist, J., says : "Upon these points the witness was entitled to be heard, either by way of express denial that he had made the statements, or by explaining or qualifying them.    We think it proper to pursue either course in the discretion of the court ; but the much more common practice, in my own experience, is to contradict the impeaching witness by asking the principal witness or party, whether he ever made the particular statements sworn to by the impeaching witness, as was done in this case."

But so far as Mrs. Glines is concerned, this point becomes immaterial here, as she was improperly admitted as a witness at all, and so far as the plaintiff was concerned the case finds that he had first stated all the conversation that he recollected, before the leading question was asked, which was following precisely the rule as recommended by Mr. Phillips, as above.

If the verdict could stand, judgment would be arrested ; but on account of exceptions taken at the trial,

*The verdict is set aside.*